# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DOUGLAS TIMBER OPERATORS, INC., et al. | |
|     Plaintiffs, | |
|        v. | Civil Action No. 09-1704 (JDB) |
| KENNETH SALAZAR, in his official capacity as Secretary of the Department of the Interior, | |
|     Defendant, | |
|     and | |
| PACIFIC RIVER COUNCIL, | |
|     Intervenor-Defendant. | |

## MEMORANDUM OPINION

Plaintiffs, timber companies and trade and workers' associations that support enhanced timber harvest in western Oregon, challenge the decision of defendant, Secretary of the Interior Ken Salazar, to withdraw the Records of Decision ("ROD") approved on December 30, 2008, that had adopted the Western Oregon Plan Revisions for six Bureau of Land Management districts. The Secretary withdrew the ROD for the Western Oregon Plan Revisions on July 16, 2009, explaining that the December 2008 approval of the Western Oregon Plan Revisions ROD was "legal error" because the Bureau of Land Management had improperly concluded that it was not obligated to engage in inter-agency consultation under the Endangered Species Act. Plaintiffs make five claims that the withdrawal decision was unlawful. First, they allege that defendant violated the Federal Land Policy and Management Act ("FLPMA"). Second, plaintiffs allege that defendant violated the rulemaking procedures under the Administrative Procedure Act

("APA"). Third, they claim that defendant violated the public notice provision of the FLPMA,

43 U.S.C. §1712(f). Fourth, they allege that defendant's breach of the 2003 Settlement

Agreement that established a December 31, 2008 deadline for revising the resource management

plans for six western Oregon districts was arbitrary and capricious and an abuse of discretion

under the APA. Fifth, and finally, plaintiffs allege that the defendant also violated the APA

because the defendant's "legal error" explanation was not rationally connected to the Secretary's

decision to completely withdraw the approved ROD. Defendant responds to each of those claims

and also challenges plaintiffs' standing. For the following reasons, the Court will grant in part

and deny in part plaintiffs' motion for summary judgment and grant in part and deny in part

defendant's cross-motion.

## BACKGROUND

A complex legal framework regarding the management of federal lands in Oregon

provides the background for plaintiffs' claims. The Oregon and California Railroad and Coos

Bay Wagon Road Grant Lands Act of 1937 ("O & C Act") provides for federal management of

the land and for the sharing of timber revenues with the Oregon counties. See 43 U.S.C. §

1181a. The Act directs an "average annual cut [to] not exceed one-half billion feet board

measure," an amount that "shall be sold annually, or so much thereof as can be sold at reasonable

prices on a normal market." Id. Furthermore, the O & C Act directs that the lands will be

managed "for the purpose of providing a permanent source of timber supply" and "contributing

to the economic stability of local communities and industries." Id.

The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-87,

governs the use of federal lands by the Bureau of Land Management ("BLM").  The FLPMA

mandates that the Bureau shall manage federal lands based on "multiple use and sustained yield

unless otherwise specified by law."  43 U.S.C. § 1701(7).  The FLPMA provides that "[t]he

Secretary shall . . . develop, maintain, and, when appropriate, revise land use plans," § 1712(a),

and "allow an opportunity for public involvement and by regulation shall establish procedures,

including public hearings where appropriate, to give Federal, State, and local governments and

the public, adequate notice and opportunity to comment upon and participate in the formulation

of plans and programs relating to the management of the public lands," § 1712(f); see also 43

C.F.R. § 1610.5.

On June 26, 1990, the northern spotted owl was listed as a threatened species by the

United States Fish and Wildlife Service under the authority of the Endangered Species Act

("ESA"), 16 U.S.C. §§ 1531-44.  See 55 Fed. Reg. 26,114-26,194.  The northern spotted owl

resides in late-successional and old-growth forests in Washington, Oregon and California,

including in the six BLM districts at issue in this case.  See id.; Fed. Def.'s Mot. for Summ. J. &

Opp. to Pls.' Mot. for Summ. J. ("Def.'s Opp'n") [Docket Entry 34] at 4.  The ESA prohibits

agencies from taking action that is likely to "jeopardize the continued existence of any

endangered species or threatened species."  16 U.S.C. § 1536(a)(2).  The ESA also imposes

procedural requirements on agencies to consult with the Fish and Wildlife Service or the

National Marine Fisheries' Service whenever a federal action "may affect" an endangered or

threatened species.  See 50 C.F.R. § 402.14(a).

These and other statutes that protect the often competing economic, aesthetic, and

environmental interests in northwest forests have been a source of intense litigation over the past

several decades. To address "litigation gridlock" between timber companies, conservationists, and the government, BLM and the United States Forest Service crafted the Northwest Forest Plan in an attempt to balance these competing interests in federal forests in a more comprehensive manner. See Def.'s Opp'n at 4. In effect, the Northwest Forest Plan reduced logging in certain areas to protect environmental interests.

The Northwest Forest Plan was the subject of a number of lawsuits in the mid-1990s. Two are particularly relevant here. The first, Seattle Audubon Soc'y v. Lyons, 871 F. Supp. 1291, 1300 (W.D. Wash 1994), aff'd, 80 F.3d 1401 (9th Cir. 1996), upheld the Northwest Forest Plan against a challenge by timber companies that the C & O Act did not permit management of those lands for any purpose other than sustained timber production. In the second case, American Forest Resource Council v. Abbey, Civ. No. 94-1031 (D.D.C.), four of the plaintiffs in this lawsuit, together with other citizens, raised the same challenges to the Northwest Forest Plan. On October 17, 2003, the parties' joint motion for voluntary dismissal was granted, pursuant to the terms of a settlement agreement. See Compl. [Docket Entry 1] ¶ 10; Def.'s Opp'n, Ex. 1 ("2003 Settlement Agreement"). The 2003 Settlement Agreement required the Bureau of Land Management to revise the resource management plans for the six western Oregon districts at issue here by December 31, 2008. Compl. ¶ 10; 2003 Settlement Agreement at 6.

On December 30, 2008, the Department of Interior adopted six revised resource management plans, collectively known as the Western Oregon Plan Revisions, for 2.5 million acres of BLM lands in western Oregon. Compl. ¶ 9; Pls.' Mot. for Summ. J. ("Pls.' Mot.") [Docket Entry 30] at 1. The ROD approving the six plans increased allowable annual timber

harvest from the 208 million board feet provided under the Northwest Forest Plan to 502 million

board feet.  Compl. ¶¶ 9, 12.  The Final Environmental Impact Statement ("FEIS") completed

prior to adopting the ROD determined that "[t]he revision of resource management plans to

allocate lands to various categories of use, with associated management direction for planning

future activities on those lands, would have no impact on listed species or critical habitat."

Administrative Record ("AR") 910 p. 94736.0951.  The FEIS continued by explaining that "[t]he

revision of resource management plans for such purpose does not create any legal right that

would allow or authorize ground-disturbing activities without further agency decision-making

and compliance with applicable statutes, including the ESA and NEPA."  Id.  Thus, because the

FEIS determined that there would be "no impact" on endangered or threatened species, BLM did

not initiate an ESA consultation on the Western Oregon Plan Revisions.

On October 30, 2008, after the FEIS had been issued, timber company plaintiffs who had

entered into the 2003 Settlement Agreement filed a motion to enforce the agreement in American

Forest Resource Council v. Abbey, Civ. No. 94-1031 (D.D.C.), arguing "that BLM's failure to

initiate ESA consultation regarding the effect of the proposed resource management plans on

threatened and endangered species was a repudiation of its implied obligation of good faith and

fair dealing in the 2003 Settlement Agreement."  Def.'s Opp'n at 9; Def.'s Opp'n, Ex. 3, AFRC's

Motion to Enforce.  They requested that the court order BLM to complete all required ESA

consultation.  The court denied plaintiffs' motion.  American Forest Resource Council v. Abbey,

Civ. No. 94-1031, Order Denying Motion [Docket Entry 103] at 1.

Subsequently, on July 16, 2009, the Acting Assistant Secretary of Interior for Land and

Minerals Management issued a two-page memorandum to the Acting Director of the Bureau of

Land Management that stated: "[b]ecause BLM's 'no effect' determination was legal error based on the record before me and applicable law, I am hereby withdrawing the WOPR RODs effective immediately." See Compl. ¶¶ 9, 13; Western Oregon Plan Revision Administrative Withdrawal Memorandum, July 16, 2009 ("Withdrawal Memo.") at 2. The public was also notified of the withdrawal decision on July 16, 2009. Compl. ¶ 13. No formal notice and comment period was provided.

## STANDARD OF REVIEW

Summary judgment is appropriate under Fed. R. Civ. Pro. 56(a) when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In a case involving review of a final agency action under the Administrative Procedure Act, 5 U.S.C. § 706, however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record. See National Wilderness Inst. v. United States Army Corps of Eng'rs, 2005 WL 691775, *7 (D.D.C. 2005); Fund for Animals v. Babbitt, 903 F. Supp. 96, 105 (D.D.C. 1995), amended on other grounds, 967 F. Supp. 2d 6 (D.D.C. 1997). Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985); see also Northwest Motorcycle Ass'n v. United States Dep't of Agriculture, 18 F.3d 1468, 1472 (9th Cir. 1994) ("[T]his case involves review of a final agency determination under the [APA]; therefore,

resolution of th[e] matter does not require fact finding on behalf of this court. Rather, the court's review is limited to the administrative record."). Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review. See Richard v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977), cited in Bloch v. Powell, 227 F. Supp. 2d 25, 31 (D.D.C. 2002), aff'd, 348 F.3d 1060 (D.C. Cir. 2003).

Plaintiffs challenge the July 16, 2009 withdrawal of the Western Oregon Plan Revision ROD under the APA as violating the requirements of the Federal Land Policy and Management Act. The APA requires that the Court "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). The court must be satisfied that the agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006). The agency's decisions are entitled to a "presumption of regularity," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one," id. at 416. The Court's review is confined to the administrative record, subject to limited exceptions not applicable here. See Camp v. Pitts, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing

court.").

**DISCUSSION**

Plaintiffs assert five challenges to defendant's July 16, 2009 withdrawal of the Western Oregon Plan Revision ROD. Plaintiffs allege that defendant violated the FLPMA, that defendant violated the rulemaking procedures under the APA, that defendant violated the public notice provision of the FLPMA, 43 U.S.C. §1712(f), that defendant's breach of the 2003 Settlement Agreement that established a December 31, 2008 deadline for revising the resource management plans was arbitrary and capricious, and that defendant's "legal error" explanation was not rationally connected to the Secretary's decision to completely withdraw the approved RODs.  As a threshold matter, the Secretary argues that plaintiff lacks standing to raise these claims.  This jurisdictional issue will be addressed first and, finding standing, the Court will then address plaintiffs' claims.

**I.      Standing**

Article III of the U.S. Constitution "limits the 'judicial power' of the United States to the resolution of 'cases' and 'controversies,'" <u>Valley Forge Christian Coll. v. Am. United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 471 (1982), and the doctrine of standing serves to identify those "'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III," <u>Lujan  v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992).  "As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." <u>Warth v. Seldin</u>, 422 U.S. 490,

-8-

498-99 (1975) (quoting <u>Baker v. Carr</u>, 369 U.S. 186, 204 (1962)); <u>see also</u> <u>Sierra Club v. Morton</u>, 405 U.S. 727, 731-32 (1972).

Standing doctrine encompasses "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." <u>Warth</u>, 422 U.S. at 498. To establish the "irreducible constitutional minimum of standing," a plaintiff must allege (1) an "injury in fact," defined as "an invasion of a legally protected interest which is (a) concrete and particularized," and (b) "actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"; and (3) a likelihood "that the injury will be redressed by a favorable decision." <u>Lujan</u>, 504 U.S. at 560-61 (internal quotation marks and citations omitted). In order for an injury to be "concrete and particularized," it must "affect the plaintiff in a personal and individual way." <u>Id.</u> at 561 n.1. Consequently, a plaintiff does not state "an Article III case or controversy" if he does no more than raise a "generally available grievance about government - claiming only harm to his and every citizen's interest in proper application of the Constitution and laws." <u>Id.</u> at 573.

The requirement that the injury be "fairly traceable" to the defendant's conduct is one of causation. In other words, is the challenged action of the defendant what caused the injury alleged? <u>See</u> <u>Shays v. Fed. Election Comm'n</u>, 414 F.3d 76, 83 (D.C. Cir. 2005). The third and final showing, that of redressability, requires a plaintiff to establish that a favorable decision on the merits of his claim will likely ameliorate the harm alleged. <u>Id.</u> Although these two concepts often overlap to some degree, <u>see</u> <u>Dynalantic Corp. v. Dep't of Defense</u>, 115 F.3d 1012, 1017 (D.C. Cir. 1997) (observing that "redressability and traceability overlap as two sides of a causation coin"), "it is important to keep the inquiries separate [so that] the 'redressability'

component [can] focus on the requested relief."  <u>Allen v. Wright</u>, 468 U.S. 737, 753 n.19 (1984).

Like the injury requirement, these two elements of the standing inquiry "assure that proper parties

have brought their dispute to the proper branch of the federal government."  <u>Florida Audubon

Soc'y v. Bentsen</u>, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc).  "Causation," the D.C. Circuit has

explained, "focus[es] on whether a particular party is appropriate; redressability, on whether the

forum is."  <u>Id.</u> at 664.

A.      Injury in Fact

The Secretary contends that plaintiffs have failed to establish the legal requirements for

standing. Here, plaintiffs allege economic injury due to potential lost timber sales, environmental

injury due to alleged increased risks of wildfire, disease or insect infestation, and procedural

injury because of a lost opportunity to comment on the withdrawal decision.  Pls.' Opp. to Def.'s

Cross-Mot. for Summ. J. & Reply in Support of Pls.' Mot. for Summ. J. ("Pls.' Opp'n") at 6.

With respect to economic harm, plaintiffs allege, and support with several affidavits, that "the

additional volume of annual timber sales will significantly benefit all of the plaintiffs" and the

withdrawal of the ROD that increased the annual allowable sale quantity of timber "caus[es]

current and threatened injury to the plaintiffs."  Compl. ¶¶ 12, 14.  Economic harm is a

"canonical example of injury in fact sufficient to establish standing."  <u>N. Carolina Fisheries

Ass'n v. Gutierrez</u>, 518 F. Supp. 2d 62, 82 (D.D.C. 2007); <u>Mountain States Legal Found. v.

Glickman</u>, 92 F.3d 1228, 1233 (D.C. Cir. 1996) ("Government acts constricting a firm's supply

of its main raw material clearly inflict the constitutionally necessary injury.").  The D.C. Circuit

in <u>Mountain States</u> rejected any requirement that a timber company must have a right to a federal

timber contract, and concluded that a timber company (in all respects similar to the timber

company plaintiffs here) suffered an economic injury in fact when its logging operations were curtailed by a ROD that limited timber harvesting.  That decision is instructive here, and the economic harm alleged by plaintiffs is also a sufficient injury in fact under Mountain States.

Plaintiffs' alleged environmental injuries also satisfy the injury-in-fact requirement, as the D.C. Circuit has allowed standing in environmental-harm cases based on an alleged increased risk of harm, such as increased risk of forest wildfires.  See Natural Res. Def. Council ("NRDC") v. EPA, 464 F.3d 1, 6 (D.C. Cir. 2006); Mountain States, 92 F.3d at 1234-35.  "[B]ecause environmental injuries are often probabilistic, the Circuit has 'cautioned that this category of injury may be too expansive.'"  Williams v. Dist. of Columbia, 530 F.Supp. 2d 119, 126 (D.D.C. 2008) (quoting NRDC, 464 F.3d at 6).  "Were all purely speculative 'increased risks' deemed injurious, the entire requirement of actual or imminent injury would be rendered moot, because all hypothesized, nonimminent 'injuries' could be dressed up as 'increased risk of injury.'  We therefore generally require that petitioners demonstrate a 'substantial probability' that they will be injured."  NRDC, 464 F.3d at 6. Thus, the Circuit allows standing based on environmental harm "when there was at least *both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin., 489 F.3d 1279, 1295 (D.C. Cir. 2007) (citing Mountain States, 92 F.3d at 1234-35) (emphasis in original).

The Court's analysis in Mountain States is again instructive here.  There, the plaintiffs brought suit to prevent the Forest Service from implementing a decision to limit timber harvesting in a national forest.  92 F.3d at 1231.  The Mountain States plaintiffs contended that the Forest Service's decision to select an alternative that allowed less logging "create[d] an

increased risk of catastrophic wildfire compared to other alternatives," supporting this claim by affidavits and the environmental impact statement. Id. at 1234. The environmental impact statement included "a table comparing the respective effects of each proposed alternative's percent reduction in 'fuel loading' – i.e. trees, dead and alive – as the gauge of its impact on wildfire risk." Id. The table projected that the Forest Service's choice would reduce high risk fuels by 5.4%, and that the timber companies' desired choice projected a 14.2% reduction. Id. The court concluded that "the potential destruction of fire is so severe that relatively modest increments in risk should qualify for standing." Id. at 1235. Thus, the D.C. Circuit found standing where the plaintiffs showed both a substantial increased risk of injury and a substantial probability of harm.

Here, plaintiffs lack the precise statistics regarding wildfire risk, but nonetheless allege that the withdrawal decision, which curtails logging in the same way as the challenged decision in Mountain States, increases a similar risk of wildfire. They also demonstrate that they would be injured by any wildfires because they live, work, and own land adjacent to the "[areas] governed by the logging decisions under review." See id. at 1234; accord Public Citizen, 489 F.3d at 1296 (noting the importance that the injury of increased risk arise "in the context of environmental harm to individuals in a specific geographic area"). Hence, the asserted environmental harm here is a sufficient injury-in-fact under Mountain States.

B.      Causation

Plaintiffs' injury also must be "fairly traceable" to the defendant's conduct. Causation demands "a causal connection between the injury and the conduct complained of" or, in other

words, "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Shays v. Fed. Election Comm'n, 414 F.3d 76, 83 (D.C. Cir. 2005). Plaintiffs allege that the harm is caused by the Secretary's decision to withdraw the ROD and thus that plaintiffs' injuries are traceable to defendant's actions. See N. Carolina Fisheries, 518 F. Supp. 2d at 82. This satisfies the second requirement for standing.

C.      Redressibility

        Defendant's most persuasive argument that plaintiffs lack standing is that reinstating the ROD at issue here would not redress plaintiffs' injuries. The Secretary asserts that BLM resource management plans are broad and programmatic, and do "not guarantee any specific level of timber harvest or any other site-specific management activity." Def.'s Opp. at 20; Def's Reply [Docket Entry 43] at 16-17. Hence, defendant argues, resource management "plans themselves are generally unreviewable; it is only specific actions implementing the plans that are subject to judicial scrutiny." See Fund for Animals v. Bureau of Land Mgmt, 460 F.3d 13, 21 (D.C. Cir. 2006)). Ultimately, defendant maintains that the remedy plaintiffs request would not redress their alleged injuries because "the link between the reinstatement of the [ROD] and actual increased timber harvests [is] too attenuated." Def.'s Reply at 10. Even if the ROD was reinstated, the Secretary asserts, "many other factors" -- such as compliance with the ESA, preparing appropriate timber sale areas, and advertising for bids -- "will impact whether, when, and how much timber harvest actually occurs on BLM timber lands." Def.'s Reply at 9.

        The Secretary relies on Norton v. Southern Utah Wilderness Alliance ("SUWA"), 542

U.S. 55, 69-70 (2004), which concluded that BLM's land use plans are "a preliminary step in the overall process of managing public lands" and that a plan "is not a final implementation decision on actions which require further specific plans, process steps, or decisions under specific provisions of law and regulations." SUWA, 542 U.S. at 69-70; see also 43 C.F.R. § 1601.0-5(k). Land use plans describe "for a particular area, allowable uses, goals for future condition of the land, and specific next steps." W. Org. Of Res. Councils v. Bureau of Land. Mgmt, 591 F. Supp. 2d 1206, 1241 (D. Wyo. 2008) (citing 43 U.S.C. § 1732(a). The ROD here, the Secretary contends, "did not approve any specific timber sale," there is "no guarantee" that the government will offer the increased allowed sale quantity, and the reinstatement of the ROD "would not ensure that plaintiffs would have increased timber volume or increased opportunity to bid on timber contracts." Def.'s Opp'n at 21.

Some courts have been persuaded by defendant's redressability argument in factually similar situations. In California Forestry Ass'n v. Thomas, 936 F. Supp. 13 (D.D.C. 1996), the district court found that plaintiff timber companies lacked standing to challenge the imposition of interim guidelines that limited logging in specific protected areas of owl habitat. See 936 F. Supp. at 16. The court reasoned that it was "more speculative than likely" that "their injuries would be redressed by a favorable decision" because the "Forest Service could still, independently, preclude the Plaintiffs from cutting down any trees around the owl habitat." Id.. at 18. Other cases outside this Circuit have ruled that timber companies lacked standing to challenge Forest Service rules because their harm was not redressable. See Wyoming Sawmills, Inc. v. U.S. Forest Service, 179 F. Supp. 2d 1279, 1299-1300 (D. Wyo. 2001), aff'd, 383 F.3d 1241 (10th Cir. 2004) (ruling that timber company plaintiffs' harm was not redressable and that

they lacked standing because "[e]ven if the increased possibility of forest fire was an injury in fact, striking down the [historic preservation plan] would not decrease that risk [of fire] because it would not guarantee that the NFS would grant logging contracts"); Region 8 Forest Serv. Timber Purchasers v. Alcock, 993 F.2d 800, 808 (11th Cir.1993) (standing denied because relief requested by timber groups -- setting aside temporary, environmentally-protective measures and returning to previous policy -- was too speculative).

But in Mountain States, the D.C. Circuit reversed the district court's ruling that timber companies lacked standing because their economic and environmental injuries were not redressable. 91 F.3d at 1233. There, plaintiffs had asked the court to order the Forest Service to select a proposed alternative plan that would permit increased logging. See id. The district court had ruled that the plaintiff's injuries would not be redressed because the alternative plan considered by the Forest Service "would run afoul of the Endangered Species Act" and would not necessarily prevent wildfires. Id. The D.C. Circuit clarified that it was improper to "allow [a] merits defect in plaintiffs' claim to defeat their standing," when the proper "redressability inquiry was simply whether, if plaintiffs secured the relief they sought, it would redress their injury." Id. "[T]he alleged impairment to redress stem[med] not from a defect in the court's institutional power to order a specific remedy -- [issuing an order that reduced logging cutbacks] -- but merely from the interplay of various statutes bearing on the substantive validity of the Forest Service decision." Id. at 1234.

Here, as in Mountain States, the Secretary cannot point to a "defect in the court's institutional power to order a specific remedy," id., and instead identifies a number of steps required between the reinstatement of the ROD and approval of a specific timber harvest.

Ultimately, plaintiffs may never obtain the amount of timber offerings stated in the December 2008 ROD because, after ESA consultation, the timber harvest may not happen, or someone else could win the bid. But "[w]hat relief (if any) plaintiffs' deserve is a question that is bound up with the merits and that lies beyond the scope of the standing inquiry." N. Carolina Fisheries, 518 F. Supp. 2d at 84. "[E]ven if the relief that plaintiffs ultimately obtain constitutes a 'Pyrrhic' victory, the Court *could* award them relief that would remove the source of their injury." Id. (internal citiations omitted); see also Mountain States, 92 F.3d at 1234 ("[T]he substantive impact of the ESA is not a remedial gap at all; to treat it as an impairment of redressibility would seemingly allow any merits defect in plaintiffs' claim to defeat their standing."). Hence, because the Court *can* order the reinstatement of the December 2008 ROD, the withdrawal of which is the alleged source of their injury, the Court possesses the authority to redress plaintiffs' injury.

Plaintiffs also assert a procedural injury, and the redressibility requirement for procedural injuries, when compared to constitutional injuries, is relaxed. See Lujan, 504 U.S. at 572 n.7 ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."). Recently, however, the Supreme Court limited Article III standing for those asserting a procedural injury, explaining that the "deprivation of a procedural right without some concrete interest that is affected by the deprivation -- a procedural right *in vacuo* -- is insufficient to create Article III standing." Summers v. Earth Island Institute, 129 S. Ct. 1142, 1151 (2009). But this limitation does not apply to plaintiffs here, as they have asserted concrete interests (economic and environmental harms) and allege only in addition that they were denied an opportunity to comment on the withdrawal decision. Plaintiffs need not "establish with any certainty" that if the

procedural defect is remedied, they will obtain the timber offerings they seek, see Lujan, 504

U.S. at 572 n.7, because as the D.C. Circuit commented in Mountain States, "even forcing the

Forest Service to rethink the issue would have some chance of affecting the cutbacks," 92 F.3d at

1233.  Plaintiffs establish standing because they have sufficiently supported their claims that "the

relief sought could, if granted, reduce the probability" of injury -- here, either economic loss due

to enhanced timber sales or the environmental harm of wildfires.  Mountain States, 92 F.3d at

1234.

D.      Prudential Standing

        Finally, Plaintiffs must establish prudential as well as constitutional standing.  The

"question of standing 'involves both constitutional limitations on federal-court jurisdiction and

prudential limitations on its exercise.'" Nat'l Ass'n of Home Builders v. U.S. Army Corps of

Engineers, 417 F.3d 1272, 1287 (D.C. Cir. 2005) (quoting Bennett, 520 U.S. at 162)).  Prudential

standing requires "that a plaintiff's grievance must arguably fall within the zone of interests

protected or regulated by the statutory provisions."  Bennett, 520 U.S. at 162; Nuclear Energy

Inst. v. EPA, 373 F.3d 1251, 1266 (D.C. Cir. 2004).  Plaintiffs "must therefore show also that the

interest they seek to protect falls 'arguably within the zone of interests to be protected or

regulated by'" the FLMPA.  Clarke v. Securities Indus. Ass'n, 479 U.S. 388, 396 (1987).  And

"on any given claim the injury that supplies constitutional standing must be the same as the

injury within the requisite 'zone of interests' for purposes of prudential standing."  Mountain

States, 92 F.3d at 1232.  "The zone of interest test, however, is intended to 'exclude only those

whose interests are so marginally related to or inconsistent with the purposes implicit in the

statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" Nat'l

Ass'n of Home Builders, 417 F.3d at 1287.

The forest management statutes "make clear a congressional intention that the national forests should play a significant role in supplying timber, an interest that firms engaged in logging and relying on the national forest as their primary source seem well suited to advance." Mountain States, 92 F.3d at 1236. Thus, plaintiffs are within the zone of interests for purposes of prudential standing, they have established standing, and hence they are entitled to judicial review of their claims.

## II.    Federal Land Policy and Management Act

Plaintiffs contend that the FLPMA does not grant the government substantive or procedural authority to "withdraw a duly adopted resource management plan," Pls. Mot. at 21, and that the Secretary's action was therefore arbitrary, capricious, and in excess of statutory authority, see 5 U.S.C. § 706. The FLPMA governs the development of BLM resource management plans. 43 U.S.C. § 1712. It states that the "Secretary shall, with public involvement and consistent with the terms and conditions of this Act, develop, maintain, and when appropriate, revise land use plans." § 1712(a). Of particular importance here, the FLPMA provides that the "Secretary shall allow an opportunity for public involvement and by regulation shall establish procedures, including public hearings where appropriate, to give Federal, State, and local governments and the public, adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands." § 1712(f).

Pursuant to these requirements, the Department of the Interior has promulgated public

participation regulations that pertain specifically to the development of resource management plans. 43 C.F.R. §§ 1610.1-8. These regulations establish a public participation process that includes publishing a notice in the Federal Register and local media "[w]hen BLM starts to prepare, amend, or revise resource management plans" and "providing opportunity for participation in the resource management plan preparation." Id. The regulations "clearly require[] a formal plan amendment anytime a proposed action changes a 'term, condition, or decision' of a resource management plan." Klamath Siskiyou Wildlands Center v. Boody, 468 F.3d 549, 556-57 (9th Cir. 2006) (quoting 43 C.F.R. § 1610.5); see also Seattle Audubon Society v. Robertson, 1991 WL 180099, at *9 (W.D. Wash. 1991) (rejecting Forest Service's adoption of a new management plan for forests in the range of the northern spotted owl through a Federal Register Notice without compliance with the public participation requirements under the National Forest Management Act).

In Klamath Siskiyou, BLM argued that policy change that reclassified the status of a red tree vole was plan "maintenance" that did not require formal procedures to amend the ROD. Id. at 556. The court disagreed, noting that the reclassification was based on "new data" and "revised policy" and could not "reasonably be defined as anything other than a change in a 'term or condition' in the resource management plan." Id. at 560. Therefore, because BLM had failed to comply with the FLPMA procedures to amend the management plan, the decisions permitting timber sales that could affect the red tree vole were set aside. Id. at 556. Here, the parties also do not dispute that the Secretary did not follow the FLPMA procedures when he withdrew the ROD on July 19, 2009. The government maintains, however, that it had "inherent authority" to reconsider and withdraw the ROD due to "legal error." Def.'s Reply at 19. The Secretary's

argument is not persuasive.

A.       Inherent Authority

A federal agency "literally has no power to act . . . unless and until Congress confers power upon it." Am. Library Ass'n v. FCC, 406 F.3d 689-98 (D.C. Cir. 2005) (quoting Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374 (1986)).  Under the FLPMA, the Secretary can "develop, maintain [and] . . . revise" land use plans. § 1712(a).  The Department of the Interior has further established by regulation procedures to revise and amend such plans, see 43 C.F.R. § 1610.5, but those regulations do not specifically discuss an agency's authority to "withdraw" a plan.  Other courts have considered a plan "withdrawal" to be equivalent to a plan modification that must proceed through traditional regulatory procedures.  See  Baker v. U.S. Dep't of Agriculture, 928 F. Supp. 1513, 524 (D. Idaho 1996) (ruling that agency's authority to modify a plan of operation – by withdrawing its prior approval – was specifically addressed and circumscribed by regulation).

The Secretary first argues that, because the FLPMA lacked "regulations on the precise point presented by the deficiently approved [ROD], the Secretary had inherent authority to correct the legal error and reinstate the preexisting [Resource Management Plan]."  Def.'s Reply at 20.  He points to a number of cases where courts have found an agency to possess authority to take action reversing a prior decision.  See, e.g., Boesche v. Udall, 373 U.S. 472, 476-77 (1963); Belville Mining Co. v. United States, 999 F.2d 989 (6th Cir. 1993); Prieto v. United States, 655 F. Supp. 1187, 1191 (D.D.C. 1987) (discussing inherent authority in the administrative adjudication context, but finding that it was "completely clear that the Secretary exceeded his

-20-

authority in reconsidering and in revoking the trust status of plaintiff's land").   Ultimately, however, these cases do not support the Secretary's "inherent authority" to withdraw the Western Oregon Plan Revisions ROD absent compliance with the FLPMA's formal notice and comment proceedings.

In Boesche v. Udall, the Supreme Court ruled that the Secretary "under his general powers of management over the public lands" had authority to administratively cancel a mineral lease that was determined to be invalid at its inception.  373 U.S. at 476-77.  But in finding this general authority, the Court considered how the judicial process was the exclusive method to correct an administrative error under the Mineral Leasing Act. Id. at 484.  The Court's ruling was expressly limited to "the exigencies of the general situation and the circumstances of this particular case" and noted that judicial safeguards were in place to "not open the door to administrative abuses."  Id. at 485.  Here, unlike in Boesche, specific administrative procedures exist under the FLPMA to amend a resource management plan, so the agency need not resort to judicial proceedings to amend a mistake.  Instead, Interior has specific regulatory authority to amend its own decisions by following procedures that require public participation.

In Belville Mining, the Sixth Circuit "conclude[d] that the Department of the Interior possessed authority to reconsider an administrative determination wherein the agency had erroneously recognized the existence of private strip mining rights." 999 F.2d at 991.  There, however, the court ruled that the Surface Mining Control and Reclamation Act and its implementing regulations "expressly authorized" the Secretary of the Interior to "reconsider and reverse . . . [his] determinations to the extent that they were erroneous."  Id. at 997-98.  The Belville Mining court also found that the initial determination "was erroneous."  Id. at 999.  But

the Sixth Circuit went on to observe that "[e]ven if an agency lacks express statutory authority to reconsider an earlier decision, an agency possesses inherent authority to reconsider administrative decisions, subject to certain limitations." Belville Mining, 999 F.2d at 998. Here, on the other hand, the Secretary relies exclusively on "inherent authority" for its withdrawal decision although FLPMA administrative procedures are in place to revise (but not to withdraw) BLM resource management plans. And the legal issue of whether the Secretary's failure to consult under the ESA prior to approving the ROD in December 2008 "was erroneous" is not properly before this Court.[1]

To be sure, the Secretary asserts that the issue of "legal error" in the development of the Western Oregon Plan Revisions ROD requires special consideration by the court. Def.'s Opp'n at 30. In support of this argument, defendant-intervenor Pacific Rivers Council contends that FLPMA procedures are not required in this instance because the Secretary's failure to engage in ESA consultation rendered the ROD "unlawful." See Tribune Co. v. FCC, 133 F.3d 61, 68 (D.C. Cir. 1998). In Tribune Co., the D.C. Circuit stated that it had previously "suggested (in dicta)

---

[1] Before the Court is the question whether the Secretary's decision to withdraw the ROD without formal proceedings under the FLPMA or the APA based on his conclusion of "legal error" was arbitrary and capricious or in excess of statutory authority. Indeed, three challenges to the BLM's alleged failure to consult under the ESA were filed in the U.S. District Court for the District of Oregon shortly after the December 2008 approval of the ROD. See Oregon Wild v. Shepard, Civ. No. 3:09-00060 (filed Jan. 15, 2009); Pacific Rivers Council v. Shepard, Civ. No. 3:09-00058 (filed Jan. 15, 2009); Forest Serv. Emp. for Env't Ethics v. U.S. Fish and Wildlife Serv., Civ. No. 6:09-06019 (filed Jan. 22, 2009). And several plaintiffs in this case, who were also parties in Am. Forest Res. Council v. Abbey, Civ. No. 94-1031, that produced the 2003 Settlement Agreement, filed a motion on October 30, 2008 under the theory of anticipatory breach in light of BLM's failure to consult under the ESA. See Civ. No. 94-1031 [Docket Entry 83] at 1-2. In that case, the court ruled that the BLM's "no effect" determination was "not facially invalid" and refrained from an "in-depth analysis" that was properly before the courts of the Ninth Circuit in the above mentioned cases. See id. [Docket Entry 102] at 2.

that where an agency is confronted with an undisputable indication that the rule is illegal, either because of the reasoning of a Supreme Court decision or intervening legislation, it may be entitled, indeed obligated, to decline to apply it." Id. But Tribune Co. does not aid the Secretary here. Indeed, the D.C. Circuit went on to explain that "a *possibility* [that a rule is unlawful] is simply not in the same ballpark as a clear manifestation that the rule, without any further inquiry, is illegal." Id. Here, the possibility that BLM's failure to consult under the ESA was unlawful does not render the ROD "unlawful" nor excuse the Secretary's failure to follow the FLPMA planning procedures.

The Secretary also contends that following the FLPMA planning procedures in light of the ROD's "legal deficiencies" improperly "elevate[s] process over reason." Def.'s Opp'n at 30. But courts often enforce procedural mandates even when an agency may reach the same decision after the required process is completed. See Util. Solid Waste Activities Grp. v. EPA, 236 F.3d 749, 752 (D.C. Cir. 2001) (rejecting "the proposition that agencies may correct their mistakes without complying with the APA's procedural requirements" and requiring EPA to correct a word processing error in final regulations through notice and comment proceedings); Tribune Co., 133 F.3d at 68 (noting that "it is hornbook administrative law" that "an agency is bound by its substantive rules unless validly amended or rescinded") (citations omitted). Hence, the Secretary lacked inherent authority to withdraw the 2008 ROD without following the procedures required under the FLPMA, and his decision to do so violated the APA.

B.      Harmless Error

Finally, the Secretary argues that even if he lacked inherent authority, plaintiffs were not

prejudiced by the failure to participate in FLPMA procedures. The APA's judicial-review

provision instructs courts to take "due account . . . of the rule of prejudicial error." 5 U.S.C.

§ 706. But the D.C. Circuit has a high standard for "harmless error" when agencies fail to

comply with procedural mandates. See Chamber of Commerce v. S.E.C, 443 F.3d 890, 904

(D.C. Cir. 2006) ("Th[is] court has not required a particularly robust showing of prejudice in

notice-and-comment cases[.]").[2] "Neither a showing of actual prejudice nor proof that the agency

would have reached a different result is required to establish prejudicial error." AFL-CIO v.

Chao, 496 F. Supp. 2d 76, 89 (D.D.C. 2006); see also Sprint Corp. v. FCC, 315 F.3d 369, 377

(D.C. Cir. 2003); McLouth Steel Prods. Corp. v. Thomas, 838 F.2d 1317, 1324 (D.C. Cir. 1988)

(procedural error can be prejudicial "[e]ven if the challenger presents no bases for invalidating

the rule on substantive grounds"). Rather, the challenging party only "must 'indicate with

reasonable specificity' what portions of the [rule] it objects to and how it might have responded if

given the opportunity." Gerber v. Norton, 294 F.3d 173, 182 (D.C. Cir. 2002) (citation omitted).

"[A]ll that is required to defeat [the agency's] claim of harmless error" is a showing that the party

could "'mount a credible challenge'" to the rule on remand. Id. at 184 (quoting Util. Solid Waste

Activities Grp., 236 F.3d at 755); see also Sprint Corp., 315 F.3d at 377 (challenger "made a

colorable claim that it would have more thoroughly presented its arguments had it known that the

[agency] was contemplating a rulemaking"); Sugar Cane Growers Co-op of Florida v. Veneman,

289 F.3d 89, 97 (D.C. Cir. 2002) (challenging party would have raised "additional considerations

. . . in a comment procedure").

---

[2]The Court sees no reason that the standard under the APA, and the case law interpreting and applying it, should not govern with respect to the FLPMA procedures at issue here.

Under these principles, plaintiffs have demonstrated that the lack of a public participation period prior to the Secretary's withdrawal decision constituted prejudicial error.  See AFL-CIO, 496 F. Supp. 2d at 89.  Indeed, plaintiffs were aware of a potential ESA defect, illustrated by how the parties to this case participated in a prior lawsuit to compel the BLM to engage in consultation under the ESA before the final December 2008 approval of the ROD.  See Am. Forest Res. Council v. Abbey, Civ. No. 94-1031 [Docket Entry 83] at 1-2.  Furthermore, the Secretary asserts, maintaining the Northwest Forest Plan had been considered as an option during the plan development that led to the adoption of the Western Oregon Plan Revisions ROD. Def.'s Opp'n at 26-27; Def's Reply at 20.  But plaintiffs have indicated with "reasonable specificity" the comments that they would make to challenge the withdrawal of the ROD on the basis of legal error. See Pls.' Reply at 25, 33-40.  As explained above, all that a challenger must show is that it could "mount a credible challenge" to the rule -- or make a "colorable claim that it would have more thoroughly presented its arguments" -- on remand.  See Sprint, 315 F.3d at 377; see also Gerber, 294 F.3d at 184.  Plaintiffs have lodged a "credible" challenge, as well as a "colorable claim" that they would have presented specific comments in response to the decision to withdraw the ROD due to legal error, had they been afforded the opportunity to do so.  See AFL-CIO, 496 F. Supp. 2d at 89. Nothing more is required to establish prejudice, and hence plaintiffs have met their burden here.

Hence, the Secretary lacked inherent authority to withdraw the December 2008 ROD, and the failure to comply with procedures under the FLPMA was arbitrary, capricious and an abuse of discretion under 5 U.S.C. § 706(2).  Although "the absence of notice and comment is not a substantive infirmity that *mandates* vacatur, it nonetheless constitutes a procedural error of

sufficient gravity for the court of appeals to have opted for vacatur recently and with some regularity." AFL-CIO, 496 F. Supp. 2d at 89; see Envtl. Integrity Project v. EPA, 425 F.3d 992, 998 (D.C.Cir.2005) (vacating rule for lack of notice and comment); Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin., 407 F.3d 1250, 1261 (D.C. Cir. 2005) (same); Util. Solid Waste Activities Grp., 236 F.3d at 755 (setting aside rule on this ground). This Court, consistent with other recent cases that also involved the Department of the Interior's repeal of agency rules without following mandated procedures, will vacate and remand the Secretary's decision to withdraw the Western Oregon Plan Revisions ROD. See, e.g., Nat'l Parks Conservation Ass'n v. Salazar, 660 F. Supp. 2d 3, 5 (D.D.C. 2009) (denying the Secretary's request to vacate and remand an amendment to stream buffer zones regulations, which the government alleged was legally deficient, because it would allow an end run around APA procedures); Carpenters Indus. Counsel v. Salazar, 734 F. Supp. 2d 126, 135-36 (D.D.C. 2010) (denying government's request to vacate the 2008 Critical Habitat Designation of the spotted owl while plan was under review because it "would allow the Federal defendants to do what they cannot do under the APA, repeal a rule without public notice and comment, without judicial consideration of the merits").

## III.    Breach of 2003 Settlement Agreement

Plaintiffs' fourth claim -- that the Secretary breached its 2003 Settlement Agreement with plaintiffs, and that the breach was arbitrary and capricious and an abuse of discretion -- is not properly before this Court. The APA waives sovereign immunity for most suits against the United States for nonmonetary relief, see 5 U.S.C. § 702, but the Tucker Act forbids federal courts from granting declaratory or injunctive relief for breach of contract, see 28 U.S.C. § 1491;

-26-

Robbins v. Bureau of Land Mgmt., 438 F.3d 1074, 1082 (10th Cir. 2006) ("[T]he APA does not waive sovereign immunity for claims that arise out of a contract and that seek specific performance of the contract as relief."); Megapulse, Inc. v. Lewis, 672 F.2d 959, 967 (D.C. Cir. 1982) ("[A]n action against the United States which is at its essence a contract claim lies within the Tucker Act and [] a district court has no power to grant injunctive relief.") The APA's waiver of sovereign immunity may not be used "to circumvent the jurisdictional and remedial limitations of the Tucker Act." Spectrum Leasing Corp. v. United States, 764 F.2d 891, 893 (D.C. Cir. 1985).

In Megapulse, the D.C. Circuit explained that whether a claim is "founded upon" a contract for purposes of the Tucker Act "depends both on the source of the rights upon which the plaintiff bases its claim, and upon the type of relief sought (or appropriate)." Megapulse, 672 F.2d at 968; see also Transohio Sav. Bank v. Dir., Office of Thrift Supervision, 967 F.2d 598, 601 (D.C. Cir. 1992) (ruling that the district court "did not have jurisdiction over [the plaintiff's] pure contract claims" but properly considered the merits of the plaintiff's statutory and due process claims against the United States). Here, plaintiffs contend that the Secretary's withdrawal of the ROD "put the Department of Interior in breach of the [2003 Settlement] Agreement," and seek injunctive relief -- that the July 16, 2009 withdrawal decision be vacated. See Compl. ¶¶ 36-39. Hence, plaintiffs' claim is based on their rights under a contract -- the 2003 Settlement Agreement -- and is therefore not within the subject matter jurisdiction of this Court and must be dismissed.

## IV.    Conclusion

Having found that the Secretary failed to follow the procedures required by the FLPMA

when he withdrew the 2008 Western Oregon Plan Revisions ROD, the Court need not reach

plaintiffs' remaining arguments -- that the decision to withdraw the ROD is a "legislative rule"

that cannot be repealed without notice and comment under the APA, and that the Secretary's

decision to withdraw the ROD because of alleged "legal error" was arbitrary, capricious, and an

abuse of discretion under the APA.  Compliance with the FLPMA public notice and participation

requirements would largely suffice under an APA notice and comment challenge.  Additionally,

because this Court is remanding the Secretary's withdrawal decision, the future record may shed

additional light on the reasoning of the Secretary regarding the Western Oregon Plan Revisions

ROD.

      For the foregoing reasons, the Court will grant in part and deny in part plaintiffs' motion

for summary judgment, grant in part and deny in part defendant's motion for summary judgment,

and vacate and remand the July 16, 2009 decision to withdraw the Western Oregon Plan

Revisions ROD.  A separate Order has been posted on this date.


            /s/ John D. Bates
            JOHN D. BATES
          United States District Judge

Date:  March 31, 2011